14584

STATE v. NESMITH

(194 S. E., 160)

*Messrs. A. C. Hinds* and *G. Badger Baker,* for appellant, cite:

*Messrs. C. T. McDonald* and *G. Lloyd Ford,* for respondent.

December 13, 1937.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

On October 12, 1936, the defendant, Nesmith, was indicted in the Court of General Sessions for Florence County for nonsupport of his wife and minor child, in violation of Section 1123 of the Code of 1932, which provides that: "Any able-bodied man or a man capable of earning or mak-

ing a livelihood who shall, without just cause or excuse, abandon or fail to supply the actual necessaries of life to his wife or to his minor, unmarried child, or children dependent upon him, shall be deemed guilty of a misdemeanor," etc. At the proper time before trial, the defendant moved for a change of venue to Williamsburg County, but his motion was refused. He was found guilty as charged, and was sentenced in accordance with the provisions of the statute.

The appeal presents four questions for decision: (1) Should the Court have granted the motion for a change of venue? (2) Was there error in the admission of testimony with regard to defendant's second marriage? (3) Did the trial Judge indicate to the jury, in his charge or otherwise, that he had formed the opinion that the defendant was guilty? (4) Was the verdict "capricious, unjust and contrary to the weight of the testimony?" These we will consider in the order named.

First. The motion for the change of venue was made "on the ground that the defendant was a resident of Williamsburg County and that the statute involved is, in effect, a civil statute, and trials thereunder should properly be regulated by the statutes determining the place of trial in civil actions." In argument, counsel for the appellant say: "The statute in question is remedial in purpose and its real object is to secure to wife and child the financial and other support of the husband. By its very terms it provides a means of securing this remedy in the nature of any other purely civil remedy. The penalty provided is, after all a mere safeguard against the violation of the provisions of the act and against the failure to comply with the terms of such requirement as may be made by the Court as to security. It, therefore, partakes decidedly more of the nature of a civil statute and a civil remedy and trials thereunder should be and are governed by the provisions of the Code with reference to the place of trial of civil actions"—

citing *State v. Bagwell,* 125 S. C., 401, 118 S..E., 767, as supporting this view.

We do not think this position can be sustained. It is true, as said in *State v. Bagwell, supra,* that the statute is intended to supplement other means and remedies for enforcing the moral and social duty of the husband to support his wife, and to that extent is remedial in purpose; but it is also there pointed out that it "is designed in part to redress the State's or society's grievance flowing from a breach of the husband's duty in that regard"—citing *State v. English,* 101 S. C., 304, 85 S. E., 721, 722, L. R. A., 1915-F., 977. In the *English case,* the Court, s p e a k i n g through Mr. Justice Gage, pointed out that the parties to the marriage contract are not alone interested in the performance of the implied obligation of the husband to support of his wife, but that all who constitute organized society have a direct interest in the event. The Court then said:

"The State has always busied itself about the domestic relations; about marriage and who may contract it, and how women may be protected from the force and stratagem of men; about children, their education, and their employment; about morality and how it shall be preserved in the family. Those forces which operate to impair the integrity of the family will finally sap the foundations of the State. Society is interested that the family shall be maintained first of all by meat and bread. The State may command that in behalf of all its members; it has commanded it by the statute under review. The penalty for the breach of the command is imprisonment. But that is not for any 'debt' due by the husband to the wife; *it is for the husband's failure to obey society's law, made for society's subsistence.* [Italics added.]

"The case is likened to the criminal statute against bastardy"—citing *State v. Brewer,* 38 S. C., 263, 16 S. E., 1001, 1002, 19 L. R. A., 362, 37 Am. St. Rep., 752.

In the *Brewer case* it was contended that the proceedings in a case of bastardy are civil rather than criminal in their nature, and that the amount which the defendant, upon conviction, is required to pay is a debt for the nonpayment of which a party cannot be imprisoned without violating the Constitution. Article 1, § 24. Mr. Chief Justice McIver, speaking for the Court, after pointing out that the question presented must be determined by the provisions of the Constitution and statutes of the State said: "So considered, it is clear to our minds that such proceedings are of a criminal and not of a civil nature. By Section 1 of Article 4, of the Constitution of this State, the Court of General Sessions is vested with criminal jurisdiction *only;* and as our statutes (Section 1582 of the General Statutes) expressly require that the issue in such cases shall be tried in that Court, it would seem to be conclusive that the legislature intended to make the offense of bastardy a criminal offense; and, as a further indication of such intention, the proceeding is commenced, just like other criminal cases, by the issue of a warrant to apprehend the party charged (Section 1579); and the use of the words 'accused,' 'acquitted,' and 'convicted,' in Section 1582, followed by the provision in the same section that upon conviction the accused shall be liable to execution as are defendants convicted of misdemeanors, points to the same conclusion. Accordingly, the unbroken practice has always been to treat a charge of bastardy as a criminal offense, for which the accused is indicted and tried in the Court of Sessions, just as in the case of other misdemeanors. Hence, whatever may be the view taken in other States, where they may have different statutes and different rules of practice, we cannot doubt that in this State a charge of bastardy must be, as it has always been, regarded as a criminal proceeding, instituted, *not* for the purpose of recovering or enforcing the payment of a *debt,* but for the purpose of subjecting the party charged to the penalty imposed by statute for a violation of the law."

When what is said in these cases is considered together, it seems clear that the proceedings had in a case of abandonment or nonsupport, declared by the statute to be a misdemeanor, are criminal rather than civil in nature. In other words, the violation of the statute is a criminal offense, "for which the accused is indicted and tried in the Court of Sessions, just as in the case of other misdemeanors". The trial Judge, therefore, properly refused to grant the motion for a change of venue on this ground.

In 8 R. C. L., 310, we find: "Generally speaking, it is a fundamental rule of criminal procedure that one who commits a crime is answerable therefor only in the jurisdiction where the crime is committed, and in all criminal prosecutions, in the absence of statutory provision to the contrary, venue must be laid as in the county of the offense, and it must be proved as laid. Such an offense as desertion or failure to provide for a wife or children is however negative, the omission of a duty, and therefore venue depends on the question where the omission to perform that duty occurs."

See *State v. McCoy,* 98 S. C., 133, 82 S. E., 280; *State v. Stone,* 111 S. C., 496, 98 S. E., 333; *State v. Peeples,* 112 S. C., 310, 99 S. E., 813; *State v. Dvoracek,* 140 Iowa 266, 118 N. W., 399; *State v. Shuey,* 101 Mo. App., 438, 74 S. W., 369; *State v. Gillmore,* 88 Kan., 835, 129 P., 1123, 47 L. R. A., N. S., 217.

In the case at bar, there was testimony to the effect that the prosecutrix and her husband went to Florence, S. C., about March, 1930, and while there, lived with her brother-in-law and sister, Mr. and Mrs. Ratley; that on December 19, 1930, a child was born to them, the hospital expenses being paid by Ratley; that on February 7, 1931, Mrs. Nesmith, pursuant to a mutual understanding between her and her husband, went on a visit to her mother at Hamlet, N. C. Mrs. Nesmith testified: "I was sent home with the intention of coming back, and he never did come for me." She further stated the total contributions made by

her husband to her and the child's support after February 7, 1931, was not more than $15.00. D. J. Ratley testified that after Mrs. Nesmith went to North Carolina, the defendant, under an agreement with the witness, took over Ratley's fruit stand; the arrangement being that Ratley was to get in payment of defendant's board $5.00 per week, the defendant to get $5.00 for himself, and $5.00 to be sent to Mrs. Nesmith at Hamlet, and that all profits above $15.00 were to be divided equally between the witness and the defendant; that at the time he turned the business over to Nesmith, the witness was making from $20.00 to $30.00 profit per week, and that when he visited the stand after Nesmith took charge of it, the witness found that the daily sales were $15.00 to $20.00 through the week and $40.00 or $50.00 on Saturday; that he discovered that the defendant was not sending the money to his wife at Hamlet; that "he wasn't living up to the obligations of supporting his family," but was spending the money otherwise; and that on one occasion at the store he saw a woman, a stranger, taking money out of the cash register.

It is clear from the foregoing testimony offered by the State, that the defendant was properly indicted in Florence County for the offense of nonsupport of his wife and child, for it was in that county, according to this evidence, he first breached his duty to contribute to their support. Any contention that, as the wife and child at the time were in Hamlet, N. C., the defendant should have been tried there, cannot be sustained. The offense was a violation of the laws of this State, not of the laws of North Carolina.

Second. When Mrs. Nesmith, the prosecuting witness, was on the stand, the solicitor asked her whether she had ever seen the defendant's "other wife." The question was objected to on the grounds or irrelevancy and incompetency, but was permitted by the trial Judge. The Court also allowed the solicitor, over objection, to cross examine the defendant with regard to the same matter. The contention is that the appellant was not being

tried for bigamy, and that the testimony thus brought out served only to becloud the issue and to create an unfavorable impression on the minds of the jury.

We think, as held by Judge Dennis, that the evidence thus elicited, in the circumstances shown, had some bearing on the issue as to whether the defendant had just cause or excuse, as claimed by him, for his failure to support his wife and child, and was admissible for such purpose. Counsel for the appellant, however, point out that the alleged second marriage occurred in Williamsburg County about July, 1936, where the defendant had been residing for several years after separation from his wife, and argue that this testimony, therefore, could have no bearing whatever on whether he was able to support her while he was a resident of Florence County, where he was indicted and being tried.

This contention is without substantial merit. The ██ offense of nonsupport is made by the statute, as this Court has held (*State v. Stone,* 111 S. C., 496, 98 S. E., 333), a continuing one. The State offered some testimony, as we have pointed out, to the effect that the defendant first breached his duty to furnish his wife and minor child with the necessaries of life in Florence County; and that, while he left that county in July, 1931, the breach was continuous to the date of his second marriage, and thereafter. It seems clear, therefore, that this testimony was admissible, not only for the reason above stated, but as tending to show that the defendant had no intention at any time of supporting his lawful wife.

Third. At the close of the State's case, the following ██ occurred: "Mr. Ford: We have one more witness, the doctor who attended Mrs. Nesmith in the hospital, and he is not here now. We will close at this time with the privilege of putting him up when he comes in. Mr. Baker: We will admit that Mrs. Nesmith had to go to the hospital when her child was born. Mr. Ford: What I want the doctor for is on the question of the unusualness of the

case. Mr. Baker: We will admit Mr. Ratley paid $75.10 as he stated. The Court: What is the objection to the doctor going on the stand? Mr. Baker: No objection at all, but we will admit what he will say in the case."

The appellant argues that the question asked by the trial Judge, as above seen, was no doubt accepted by the jury as indicating the belief that the defendant wished to conceal something. We do not think so. Counsel for the State and for the defense were addressing their remarks to the Court; the solicitor insisting that he desired to call a certain witness later, and counsel for appellant that they would admit certain facts, which would make the calling of such witness unnecessary. In this situation, the decision of the matter resting with the trial Judge, the question, following as it did the remarks of counsel, was not an improper inquiry of the Court, and could not have had the effect contended for by the appellant.

Again, in his cross examination of the defendant, the solicitor questioned him as to "how many wives" he had, and he replied that he had only "one legal wife." Counsel for the defense objected to this testimony on the ground that it was "irrelevant as to whether he has another wife. He says he has one legal wife, and that is all that the laws of the State of South Carolina recognize." The trial Judge, in ruling upon the question, said: "It depends on which one he calls his legal wife as to whether he is under legal obligation to support her or not. I don't know anything in this case up to the present that excuses him from supporting the woman, and it is not for me to say that there is any evidence excusing him from supporting her or not."

While it is conceded that this statement in itself contains no expression of error, it is contended that the last sentence quoted was equivalent to saying that the fact of nonsupport had been proved and that the defendant had failed to establish any justification therefor. We are not in accord with this view. It was admitted that the appellant had married

again after separation from the prosecuting witness, and the question was as to his legal obligation in the matter of support. In making his ruling, the trial Judge had this point in mind; and he first said, as is seen, that the defendant was under legal obligation to support his lawful wife. Hence, as all the evidence, to that stage of the trial, was to the effect that the prosecuting witness was the lawful wife of the defendant, and as the appellant himself made no denial of that fact, the Court correctly stated that nothing appeared in the case up to that time which would excuse the appellant from supporting the woman; that is to say, it appearing that the prosecuting witness was the defendant's lawful wife, he was under legal obligation to support her. But the trial Judge was careful, in the same connection, to add that it was not for the Court to say whether there was "any evidence excusing him from supporting her or not." By this he meant and in effect said, that it was a question for the jury to determine, even though the prosecuting witness was the legal wife, whether the defendant had shown "just cause or excuse," which was a question of fact for them under the evidence, for failure to support her. It seems clear, when the remarks of the Court are considered together and properly analyzed, that the contention of the appellant is without merit.

Again, in charging the jury, the trial Judge, with regard to the legal duty of the husband to support his wife, told them, *inter alia,* that "the law requires him, if he has a home, to share it with her, and it requires her to share the home with him;" but if he is unable to provide a home for her, "then as long as he is able he must contribute to the purchase or payment for the ordinary necessaries of life for the support of his wife or children." With reference to the place where the wife and children are entitled to have the support, he charged that if the husband could not provide a home for them, it would make no difference where they were; if he sent them somewhere else or agreed that

they should stay somewhere else, he would be under the obligation to contribute to their support. For instance, if the wife and husband were living in Florence County, and it was agreeable with him that she go to North Carolina, and he was able to contribute to her support and did not do it, the fact that she and the baby were in North Carolina would not relieve him of the duty in this State to support her. He then added, according to the record for appeal: "Where this county was his home, he was living here at that time, it doesn't mean he had to be living here at this time, but at the time of his abandonment of his wife and child and failure to support them."

The appellant argues that the last above-quoted portion of the instructions of the trial Judge was a charge on the facts, indicating that in his opinion "the fact of abandonment and failure to support the appellant's wife and child had been definitely established." We do not think so. The State charged the defendant with having committed the offense of nonsupport in Florence County and offered some evidence, as we have said, in proof thereof. The appellant admitted that he had not contributed anything to the support of his wife and child after he left that county, which was some five or six years before he was indicted; but testified that he did the best he could in the way of their support while he was living there. The trial Judge charged in effect, as above indicated, that to make the offense complete in Florence County did not mean that the defendant had to be living there at the time of his trial, but at the time of abandonment or failure to support. While the language used is not as clear as it might have been, still we are satisfied, when the charge is considered as a whole, which must be done in determining whether there was error as contended, that there is no substantial merit in the complaint made.

Fourth. It does not appear that the defendant asked for a new trial for the reason stated in this question. Therefore, even if correct as to form, the question

is not properly before us. We may say, however, in passing, that the Court charged the jury that before a conviction could be had the State was required to prove the defendant's guilt beyond a reasonable doubt. There was testimony requiring the submission of the case to the jury, and all questions of fact, as made by the evidence, were for them.

The judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on account of illness.